**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **AUTOPARTSOURCE LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )      **Civ. A. No. 3:13CV054** |
| | ) |
| **STEPHEN C. BRUTON** | ) |
| | ) |
| **and** | ) |
| | ) |
| **BBH SOURCE GROUP LLC,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MEMORANDUM IN SUPPORT
OF MOTION FOR ENTRY OF DEFAULT JUDGMENT
AGAINST DEFENDANT BBH SOURCE GROUP LLC**

AutoPartSource LLC ("APS"), by counsel and pursuant to Rule 55(b) of the Federal

Rules of Civil Procedure, respectfully submits this Memorandum in Support of its Motion for

Default Judgment against Defendant BBH Source Group LLC ("BBH") for its failure to plead or

otherwise defend itself in this case.  In support of its Motion for Default Judgment, APS states as

follows:

## I.      <u>INTRODUCTION</u>

As an initial matter, this Court has the authority to enter default judgment against BBH.

First, this Court has both subject matter and diversity jurisdiction over this case as well as

personal jurisdiction over BBH because it has transacted business in the Commonwealth of

Virginia.  Second, this Court is the proper venue to bring this action under 28 U.S.C. §

1391(a)(1), because a substantial part of the events giving rise to the claims occurred in this judicial district. Last, APS properly served BBH through its registered agent.

This Court should enter default judgment against BBH because APS has alleged sufficient facts to establish its claims for misappropriation of trade secrets, tortious interference with contract, and tortious interference with business expectancy. Thus, this Court should grant a permanent injunction against BBH prohibiting it from using or disclosing APS's trade secrets, a worldwide production injunction against BBH for a period of seven (7) years, an award of compensatory damages in the amount of $1,131,801.55, punitive damages in the amount of $350,000, and $58,997.72 in attorneys' fees and costs, and post-judgment interest as provided under 28 U.S.C. § 1961.

## II. STATEMENT OF RELEVANT FACTS

APS is an aftermarket automotive parts manufacturer/distributer and distributes a number of automotive products, including brake-related products, clutch systems and filters. Since its inception in 2004, APS has sourced automotive parts from China to deliver to its customers in the United States, which allows APS to source parts at a reasonable cost and pass those savings along to its customers. Compl. ¶¶ 12-13. APS has developed a body of proprietary information and trade secrets related to its business, specifically information about contacts, customer needs, price, costs, vendor quality and development of products. Compl. ¶ 15. APS has taken reasonable and necessary precautions to protect these trade secrets and confidential information. Compl. ¶¶ 16-21.

On April 26, 2004, Defendant Stephen C. Bruton ("Bruton") accepted an offer to work for APS as Director of Product Development. Compl. ¶ 24. In this role, Bruton was exposed to APS's confidential and proprietary information, including information related to sales,

2

marketing, pricing, customer contacts, historical customer information, product development and strategic and tactical plans.  Compl. ¶ 27.  Specifically, Bruton was familiar with APS's strategic relationships with large customers, including but not limited to Intex Auto Parts ("Intex").  *Id.*

Beginning in 2010, APS expanded Bruton's role to include sourcing parts in China to obtain a broader product line for its customers.  Compl. ¶ 29.  APS trained Bruton on how to source a product internationally, assigned him Chinese national Lili Huang ("Huang") to assist him with his responsibilities, and sent Bruton to various trade shows and to China to develop relationships with Chinese vendors.  Compl. ¶¶ 29-30.  When Huang was retained, she executed an Agreement with APS agreeing she would not represent any other company while contracted by APS ("Huang's Agreement").  Compl. ¶ 31.  As a result of Bruton's expanded role, both he and Huang were given access to additional trade secrets, confidential and proprietary information, including but not limited to information about APS's prospective vendors, APS's relationship with current vendors, what parts were made at certain vendors, the quality of the parts made, the pricing for the parts, what vendor parts were then sold to specific APS customers and the selling price for the parts for each customer.  Compl. ¶ 35.

On or about December 28, 2012, APS discovered that Bruton, Huang, and Mitchell Bennett (the President of a former competitor business from which APS purchased the assets in 2004) had formed Defendant BBH, an entity which engages in the business of providing wholesale automotive parts, including brake-related products, clutch systems and filters, and which directly competes with APS.  Compl. ¶¶ 37-38.  BBH had been in operation since at least August 2011, well over one year before Bruton and Huang disclosed its existence to APS. Compl. ¶ 57.  On December 31, 2012, APS terminated Bruton's employment, collected his

Company-owned laptop, keys, access cards, and other Company property, and escorted him out of the building.  Compl. ¶ 43.

Subsequent forensic analysis of Bruton's former Company-owned laptop revealed that Bruton had stored documents on two different USB thumb drives and had accessed those documents from those thumb drives on his Company-owned laptop on December 6 and December 23, 2012.  Compl. ¶ 55; *see also* Ex. 1, Declaration of Kevin Cantwell ("Cantwell Decl.") at ¶ 4.  Further, the forensic analysis uncovered documents related to BBH's business and Skype chats about BBH.  These Skype chats show that Bruton and Huang planned to start BBH as early as August 2011 and that they intended to use their relationships with APS and APS's goodwill and reputation to generate business for BBH.  Compl. ¶ 57; Ex. 1, Cantwell Decl. at ¶ 7, Ex. C.  APS has also discovered at least one APS internal document which Bruton used to assist him in managing BBH.  Compl. ¶ 61.

For well over a year, Bruton had been traveling to China at APS's expense and arranging his own meetings with APS's vendors on behalf of BBH.  For example, in January 2012, during Bruton's employment with APS, BBH sourced brake rotors from Longkou Fuyuan Foreign Economy ("Fuyuan"), one of the vendors in China whom APS sent Bruton to meet and establish a relationship with on behalf of APS.  Compl. ¶ 63.  The brake rotors were sent directly to APS's customer, Intex.  *Id.*  Over the course of 2012, BBH sourced several other parts from Fuyuan directly to Intex.  BBH is also selling the products of another vendor whom APS sent Bruton to China to meet in April 2012.  Compl. ¶ 64.  Bruton has been using APS's trade secrets, confidential and proprietary information related to current and prospective vendors, the quality of their products, cost and pricing, and historical sales to customers to contract with APS vendors

and potential vendors on behalf of BBH to source the same products in the United States in direct competition with APS. Compl. ¶ 66.

On January 28, 2013, APS filed a Complaint in this Court against Bruton[1] and BBH asserting numerous counts, including, but not limited to, misappropriation of trade secrets in violation of the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code § 59.1-336, et seq., tortious interference with a contract and tortious interference with a business expectancy. This Court issued a Summons on January 29, 2013. APS timely served process on BBH by delivering a copy of the Summons and Complaint to BBH's registered agent on February 5, 2013. BBH failed to plead or otherwise defend the action. The Clerk of this Court entered default against BBH on March 6, 2013. D.I. 13.

### III. ARGUMENT

Federal Rule of Civil Procedure 55 provides that a court may enter default judgment upon application by a party. See Fed. R. Civ. P. 55(b)(2). A court should enter default judgment against a defendant if the defendant fails to plead or otherwise defend itself. *See e.g., Music City Music v. Alfa Foods, Ltd.,* 616 F. Supp. 1001, 1002 (E.D. Va. 1985); *JTH Tax, Inc. v. Smith*, No. 2:06cv76, 2006 U.S. Dist. LEXIS 42584 (E.D. Va. June 23, 2006). The party requesting default judgment must show: "(1) when and against what party the default was entered; (2) the identification of the pleading to which default was entered; (3) whether the defaulting party is an infant or incompetent person; (4) that the defendant is not in the military services; and (5) that notice has been served on the defaulting party, if required by Fed. R. Civ. P. 55(b)(2)."

---

[1] Three days shy of the deadline for filing his Answer, Bruton filed for bankruptcy in the United States Bankruptcy Court for the Northern District of California. Consequently, the pending litigation against Bruton is stayed.

*Toolchex, Inc. v. Trainor*, 3:08cv236, 2009 U.S. Dist. LEXIS 64186, at *3 (E.D. Va. July 24, 2009) (quoting *JTH Tax*, 2006 U.S. Dist. LEXIS 42584).

Default was entered against BBH on March 6, 2013.  D.I. 13.  BBH is not an infant or incompetent person, nor is BBH in the military.  D.I. 12, Ex. 4.  Lastly, BBH has not appeared on its own behalf, or by counsel, at any time during the litigation.  For these reasons, the Court should enter default judgment as to liability against BBH.

A.    APS Has Alleged Sufficient Facts to Support its Claims

APS requests judgment in its favor because the allegations in its Complaint are sufficient to establish its claims against BBH.  Upon entry of default, the facts alleged in the Complaint are deemed admitted.  *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)); *see also DIRECTV, Inc. v. Rawlins*, 523 F.3d 318, 322 n.2 (4th Cir. 2008) (citing *Ryan*); *Partington v. Am. Int'l Specialty Lines Ins. Co.*, 443 F.3d 334, 341 (4th   Cir. 2006) (default has effect of admitting factual allegations in complaint); *Marion County Court v. Ridge*, 13 F.2d 969, 971 (4th Cir. 1926) (default admits well-pled facts) (citations omitted).  However, a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover. *Ryan*, 253 F.3d at 780 (citation omitted).  Accordingly, before granting default judgment, a court must "determine whether the well-pleaded allegations in [the plaintiff's] complaint support the relief sought in this action." *Id.*  (citation omitted).

In this case, APS has alleged sufficient facts to establish its misappropriation of trade secrets claim against BBH.  Under the VUTSA, Va. Code §§ 59.1-336 through 343, misappropriation is defined as:

    1.    Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

      2.      Disclosure or use of a trade secret of another without express or implied consent by a person who:

          a.      Used improper means to acquire knowledge of the trade secret; or

          b.      At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

             i.      Derived from or through a person who had utilized improper means to acquire it;

             ii.      Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

             iii.      Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

             iv.      Acquired by accident or mistake.

Va. Code § 59.1-336.  In turn, "trade secrets" are defined as "information, including but not limited to, a formula, pattern, compilation, program, device,  method, technique, or process," that:

      1.      Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

      2.      Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.*

APS has sufficiently alleged facts establishing that BBH misappropriated APS's trade secrets.  Although there are several permissible avenues which the claim may be prosecuted under Va. Code § 59.1-336, APS need only satisfy one of the available subsections to state the claim.  *Alliance Tech. Group, LLC v. Achieve 1, LLC*, 2013 U.S. Dist. LEXIS 4708, 18-19 (E.D. Va. Jan. 11, 2013).  APS alleged that Bruton, on behalf of BBH, continued his employment with BBH to acquire APS's trade secrets.  Bruton then used APS's trade secret, confidential and proprietary information related to current and prospective vendors, the quality of their products, cost and pricing, and historical sales to customers to contract with APS vendors and potential vendors on behalf of BBH to source the same products in the United States in direct competition with APS.  Compl. ¶¶ 66, 73.  The misappropriated information was not readily known and

could not be recreated from public literature without a significant expenditure of time and effort. Compl. ¶¶ 15, 69.  APS went to great lengths to keep this information confidential, and derived great value from its confidentiality.  Compl. ¶¶ 16-21, 70.  BBH's knowledge of the trade secrets, coupled by its use of them, is enough to state facts sufficient to support a misappropriation of trade secrets claim.

APS further alleged facts sufficient to support its claim and damages for tortious interference of a contract.  To state a claim for tortious interference with a contract that is not terminable at-will (as is asserted for Huang's breach of contract), APS must state facts sufficient to show: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the alleged tortfeasor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damages." *Alliance Tech. Group*, 2013 U.S. Dist. LEXIS 4708, at *23-24; *Preferred Sys. Solns., Inc. v. GP Consulting, LLC*, 284 Va. 382, 732 S.E.2d 676, 687-88 (Va. 2012) (citing *Maximus v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 493 S.E.2d 375, 378 (Va. 1997); *Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 832, 836, (Va. 1987)).  Here, there is no question that Huang entered into a contract with APS in which she agreed she would not represent any other company while contracted by APS.  Compl. ¶¶ 31, 82.  BBH, through both Huang's and Bruton's knowledge, knew that Huang was not permitted to represent any other company while working for APS.  Compl. ¶¶ 39, 83.  Yet, in inducing Huang to perform work for BBH, BBH caused Huang to breach her contractual obligations to APS.  Compl. ¶¶ 57, 62, 84.  APS suffered damages because it continued to pay Huang's contracted rate and reimburse her expenses, even though she was in breach of the contract by performing work for a direct

competitor.  Thus, APS has stated sufficient facts to prove a claim for tortious interference of Huang's Agreement.

APS further has alleged facts sufficient to show BBH's tortious interference of APS's business expectancy with Intex and possibly other customers.  Unlike its contract with Huang, APS's contract or business relationship with Intex was terminable at-will.  Thus, in addition to the factors referenced above, APS must further show that BBH employed "improper methods" of interference.  *Duggin*, 234 Va. 221, 360 S.E.2d at 836 (quoting *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 230 Va. 396, 337 S.E.2d 744, 748 (Va. 1985); Restatement (Second) of Torts, § 766 cmt. g (1979)).  Improper interference includes "those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules . . . violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship."  *Id.*  In addition, improper methods may also include a violation of "an established standard of a trade or profession or . . . unethical conduct, [s]harp dealing, overreaching, or unfair competition." *Id.* at 837 (citations omitted).

In the present case, APS had an ongoing business relationship with Intex.  Compl. ¶¶ 27, 63; Ex. 2, Declaration of John Amalfe ("Amalfe Decl.") at ¶ 17.  In 2010, the year before any misconduct on the part of BBH, Bruton or Huang, APS made $66,745.41 in profits from the sale of its products to Intex.  Ex. 2, Amalfe Decl." at ¶ 18.  This was consistent with the amount of profits APS had made from Intex in preceding years; thus, APS had a business expectancy to continue to receive approximately that amount of profits from Intex each year.  However, in 2011, the amount of profits APS made from sales to Intex decreased to $47,280.97.  *Id.* at ¶ 19. In 2012, when BBH consistently sourced products for Intex, the amount of profits dropped even

9

further to $35,619.00.  *Id.* at ¶ 20.  Thus, APS suffered lost profits and will continue to do so.  *Id.* at ¶ 21.  In sourcing the products to Intex through BBH, Bruton was breaching his fiduciary duty to APS, using APS's confidential and proprietary information, and competing unfairly to hijack one of APS's customers.  Thus, through Bruton, BBH used improper means to interfere with APS's business relationship with Intex.

      B.      <u>APS Is Entitled to Permanent Injunctive Relief</u>

While this is a default judgment motion, a permanent injunction still may be granted.  *See, e.g. Hammerhead Entm't, LLC v. Ennis*, 4:11cv65, 2011 U.S. Dist. LEXIS 78102, (E.D.Va. July 19, 2011); *Toolchex*, 2009 U.S. Dist. LEXIS 64186, at *4.  The VUTSA allows a court to enjoin actual or threatened misappropriation.  Va. Code § 59.1-337(A).  Once a violation of the VUTSA is established, a plaintiff need not "prove irreparable harm or the lack of an adequate remedy at law to receive an injunction against the actual misappropriation."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09cv58, 2012 U.S. Dist. LEXIS 123890, at *39 (E.D. Va. Aug. 30, 2012).  However, a court still must balance the hardships and consider how the public interest will be affected by the grant or denial of the injunction.  *Id.* at *40-41.  In the end, the issuance of the injunction is a matter of judicial discretion.  *Id.* at 40.

As set forth above, APS sufficiently alleged facts showing BBH's misappropriation, and BBH has by its default conceded those facts.  Thus, a violation of the VUTSA has been established.  To determine whether a permanent injunction should ensue, the Court must balance the hardships and consider the public interest.  APS is able to satisfy both elements in its favor and, thus, the Court should, at minimum, award a permanent injunction against BBH for any future, actual or threatened misappropriation of APS's trade secrets.

1.      The Balance of Hardships Clearly Favors APS Because an Injunction
Only Prevents BBH from Doing What the Law Already Prohibits

The balance of hardships analysis requires an assessment of the harms facing both parties. *E.I. du Pont de Nemours & Co.*, 2012 U.S. Dist. LEXIS 123890, at *44. In the present case, BBH robbed APS of trade secrets related to sales, marketing, pricing, customer contacts, historical customer information, vendor relationships and vendor quality analyses and control. Thus, trade secrets that took time and resources to develop are no longer the secret property of APS. Moreover, this harm was inflicted by a new company trying to compete directly with APS. At least one of APS's customers has moved a substantial amount of its business from APS to BBH. If the Court allows the status quo to continue, APS will likely lose future business to BBH as well. One way the harm to APS "can be ameliorated substantially, or at least significantly forestalled" is "by foreclosing the competitor from using the fruits of its theft to inflict further harm on its victim." *Id.* at *45.

Should the Court not grant the injunction, APS would be forced to endure further misappropriation and to bring successive suits for monetary damages upon each fresh misappropriation of a trade secret by BBH. *See, e.g., Hammerhead*, 2011 U.S. Dist. LEXIS 78102, at *23 (finding money damages inadequate when plaintiff would suffer continued infringement). To require APS to file a Complaint each time BBH misappropriates its trade secrets would be unduly burdensome to APS and to the federal judiciary. Indeed, successive lawsuits would be pointless here given that BBH has demonstrated that it likely will not respond to future Complaints. Accordingly, an injunction is the only way to prevent further misappropriation.

In contrast, if the injunction is granted, BBH will suffer only the inability to use or disclose APS's stolen trade secrets, a hardship this Court does not have to recognize. An

injunction here "simply prevents [BBH] from doing that which the law already prohibits." *E.I. du Pont de Nemours & Co.*, 2012 U.S. Dist. LEXIS 123890, at *46 (quoting *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 1:04cv977, 2007 U.S. Dist. LEXIS 88763 (M.D.N.C. Nov. 30, 2007)). Moreover, "[t]he injury [BBH] might suffer if an injunction were imposed may be discounted by the fact that [BBH] brought that injury upon itself." *Id.* (quoting *Nat.'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 230 (D.N.J. 2009)). Therefore, the balance of hardships potentially experienced by both parties clearly weighs in favor of an injunction. In that way, the harm to APS can be significantly ameliorated without any harm to BBH except that which it brought upon itself and which, by right, it should suffer.

2. The Public Interest is Served by Protection of Trade Secrets

The public interest would be served here by protection of trade secrets and discouragement of unfair trade practices. *MicroStrategy, Inc. v. Bus. Objects*, *S.A.*, 369 F. Supp. 2d 725, 736 (E.D. Va. 2005) ("[T]here is certainly a significant public interest in maintaining the confidentiality of trade secrets and preventing their misappropriation."). As this Court has recognized:

> In a global economy where many companies do not accord trade secrets the respect and protection extended by the Uniform Trade Secrets (which is broadly in effect in this country), it serves the public interest for those who would violate the protections afforded by these laws to know that, if they steal trade secrets, they will be caught, they will be prosecuted civilly, and they will not be able to profit from that which they have stolen. And, thus, injunctive relief will help serve as a deterrent to trade secret misappropriation.

*E.I. du Pont de Nemours & Co.*, 2012 U.S. Dist. LEXIS 123890, at *50-51. Thus, this factor too weighs heavily in favor of granting an injunction.

Because both of the permanent injunction factors clearly favor APS, the Court should, at minimum, permanently enjoin BBH from further use of APS's trade secrets and confidential and proprietary information.

C.   Scope of the Injunction

    1.   The Court Should Issue a Use Injunction and a Production Injunction

Considering the facts of this case and the nature of Defendants' conduct, an injunction against use and disclosure alone would be insufficient to protect AFS's trade secrets and prevent BBH's continued misappropriation. Therefore, in addition to the use and disclosure injunction, the Court should also issue what is commonly referred to as a production injunction and enjoin BBH from competing as a distributer of aftermarket automotive parts.

A production injunction is appropriate "in circumstances where a use injunction would be ineffective in eliminating the competitive advantage gained by the misappropriation." *Gen. Elec. Co. v. Sung*, 843 F. Supp. 776, 779 (D. Mass. 1994). "[P]ast cases have recognized the potential difficulty an enjoined party would face in not using or disclosing secret information as justifying injunctions prohibiting such party from *working in the area* to which the secrets relate." *E.I. du Pont de Nemours & Co.*, 2012 U.S. Dist. LEXIS 123890, at *54 (*quoting Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1234 (W.D.N.Y. 1994)) (emphasis added). Thus, where the "misappropriator cannot be relied upon to unlearn or abandon the misappropriated technology," *id.* at *53 (*Gen. Elec. Co. v. Sung*, F. Sup. 776, 780 (D. Mass. 1994), or where "the misappropriator would have difficultly completely divorcing his knowledge of the misappropriated trade secrets" from a future work area to which the secrets relate, *id.* at *54 (*citing Monovis, Inc.*, 905 F. Supp. at 1234), a production injunction may be necessary to protect the trade secrets from future use.

Here, Bruton and Huang started BBH, a business that engaged in the wholesale distribution of automotive parts and competed directly with APS, *during* their employment with APS, used APS's trade secrets, confidential and proprietary information related to current and prospective vendors, the quality of their products, cost and pricing, and historical sales to customers in creating BBH, operated BBH while continuing their employment with APS for over a year, and conducted business on behalf of BBH at the expense of APS.  The record demonstrates that BBH's "entire operation has been built upon [APS's] techniques, methods, materials and design."  *Id.* (*quoting Head Ski Co. v. Kam Ski Co.*, 158 F. Supp. 919, 924 (D. Md. 1958)).  The misappropriated trade secrets are "inextricably intertwined" in BBH's business model, and it would be "virtually impossible" for BBH to act as a distributor of aftermarket automotive parts without employing APS's misappropriated trade secrets.  *Id.* at *58-59.  Given these circumstances, a production injunction is warranted.

In determining whether a production injunction is needed, courts have also considered "the likelihood of the misappropriator complying with a use injunction measured in part by assessing the misappropriator's conduct in effecting the misappropriation, in particular the misappropriator's utter disregard of the trade secret owner's rights" and in part by assessing "the misappropriator's conduct in the litigation."  *Id.* at *54-55.  Here, BBH and its agents, Bruton and Huang, have shown a complete disregard for APS's trade secret rights.  The business was formed and received an unfair competitive advantage by using APS's trade secrets.  For well over a year, Huang worked for BBH in violation of her contract with APS.  For the same time period, both Huang and Bruton worked for BBH while working simultaneously for APS and conducted business for BBH at APS's expense and on APS's time.  BBH's "conduct in effecting the misappropriation evinced a brazen and rather thorough disregard of, and disrespect for, the

law, as well as for [APS's] rights." *Id.* at *55. "Such disregard for [APS's] trade secrets . . . counsels in favor of minimizing the risk of any further use and disclosure of the same by all available means," including the issuance of a production injunction. *Monovis, Inc.*, 905 F. Supp. at 1235.

BBH and Bruton's pre- and post- litigation conduct further demonstrates the necessity of a production injunction in assuring that BBH does not continue to misappropriate APS's trade secrets. First, after APS discovered Bruton's wrongful conduct and terminated Bruton's employment, Bruton, an agent of BBH, reentered APS's facility without permission, accessed his former Company-owned laptop without authorization, and deleted numerous documents on two separate occasions. Ex. 2, Amalfe Decl. at ¶¶ 10-13. These documents included BBH business documents and APS confidential, proprietary and trade secret information. Thus, BBH made further attempts to conceal its misappropriation and wrongful conduct and continued to show a manifest disregard for APS's trade secrets rights. Next, Bruton filed a claim for unemployment insurance following APS's termination of his employment. During the unemployment insurance proceedings, Bruton initially made false representations to the California Employment Development Department in an attempt to further deny his wrongful conduct in misappropriating APS trade secrets and conducting business on behalf of BBH at APS's expense, but eventually recanted these statements. *Id.* at ¶ 23. Finally, following APS's initiation of this lawsuit, BBH failed to respond despite proper service, thus denying APS the opportunity to engage in discovery and fully understand the extent of Defendants' misappropriation and other wrongful conduct. Bruton also filed for bankruptcy in a veiled attempt to avoid this litigation.[2] This pre-

---

[2] Bruton initially filed for Chapter 13 bankruptcy despite the fact that his secured debts exceeded the limits for Chapter 13. Rather than face the inevitable dismissal, Bruton requested the court to

and post- litigation conduct demonstrates that BBH "cannot be trusted to avoid using the misappropriated [trade secrets] and cannot be trusted to obey an Order that permits them to exercise any discretion." *Wyeth v. Natural Biologics, Inc.*, No. 98-2469 (JNE/JGL), 2003 U.S. Dist. LEXIS 17713, at *73 (D. Minn. 2003) (granting production injunction where the defendant had destroyed records to conceal its misappropriation and made misrepresentations to a federal agency); *see also E.I. du Pont de Nemours & Co.*, 2012 U.S. Dist. LEXIS 123890, at *59-61 (granting production injunction where the defendant had retained or sought access to trade secrets through the plaintiff's former employees knowing full well that they were under contractual obligations not to disclose such information and stole the contents of a former employees' computer).

Ultimately, the misappropriated trade secrets at issue are inextricably intertwined with BBH's business procedures, and BBH's conduct in effectuating the misappropriation and in attempting to conceal the misappropriation reflects a complete disregard for the law and APS's trade secrets rights. "An injunction against use and disclosure alone would be insufficient to achieve the requisite equity in this case." *Monovis, Inc.*, 905 F. Supp. at 1234. Therefore, the Court should enjoin BBH from competing in the market as a distributer of aftermarket automobile parts.

### 2.  APS Is Entitled to a Worldwide Injunction

A worldwide injunction is warranted in this case to "protect the secrecy of the misappropriated information and to eliminate any unfair headstart [BBH] may have gained." *E.I. du Pont de Nemours & Co.*, 2012 U.S. Dist. LEXIS 123890, at *62 (internal quotations omitted).

---

convert his bankruptcy to Chapter 7, which further delays a determination on APS's claims against Bruton.

In determining the appropriateness of a worldwide injunction, this Court has considered

numerous factors, including:

> "(a) The nature of the interest to be protected;
> (b) The nature and extent of the appropriation;
> (c) The relative adequacy to the plaintiff of an injunction and of other remedies;
> (d) The relative harm likely to result to the legitimate interests of the defendant if an injunction is granted and to the legitimate interests of the plaintiff if an injunction is denied;
> (e) The interests of third persons and of the public;
> (f) Any unreasonable delay by the plaintiff in bringing suit or otherwise asserting its rights;
> (g) Any related misconduct on the part of the plaintiff; and
> (h) The practicality of framing and enforcing the injunction."

*Id.* at *63 (*quoting* Restatement (Third) of Unfair Competition § 44(2)).[3]

Here, the nature of the trade secrets involved relate to current and prospective vendors,

the quality of their products, cost and pricing, and historical sales to customers—all valuable

secret information that has enabled APS to obtain fast turn-around times on orders and maximize

its customers' inventory turns for profitability and has provided APS with a competitive

advantage in the marketplace.  As discussed above, the nature and extent of the misappropriation

was pervasive:  BBH was formed using APS's trade secrets and was then operated by APS

employees for over a year at APS's expense.  Any monetary damages awarded will likely prove

insufficient to protect APS's interests.  Defendants are avoiding this lawsuit through their failure

to appear and/or bankruptcy filings, and APS will likely face difficultly in enforcing any

monetary judgment obtained.  APS quickly asserted its rights by filing this lawsuit only a month

following its discovery of the misappropriation and has engaged in no misconduct.  Finally,

framing and enforcing a worldwide production injunction is not impractical.  Accordingly, all of

the factors weigh in favor of granting a worldwide injunction.

---

[3] The relative harm to BBH and APS, as well as the interests of third persons and the public, have been previously discussed.

3.    A Seven-Year Production Injunction Is Necessary

"Usually the duration of an injunction is designed to preclude defendants' wrongful activities for a period of time reasonably necessary to protect plaintiff's interest." *Id.* at *79 (internal quotations omitted).  Indeed, the VUTSA recognizes that an injunction is appropriate for the life of the trade secret and to eliminate any commercial advantage that otherwise would be derived from the misappropriation.  Va. Code § 59.1-337(A).  As described above, BBH's entire operation has been built using APS's trade secrets, including information related to current and prospective vendors, the quality of their products, cost and pricing, and historical databases on sales to customers and specifications for auto parts.  A production injunction is necessary because APS's misappropriated trade secrets infiltrate virtually every aspect of BBH's operations and it is impossible for BBH to act as a distributor of aftermarket automotive parts without utilizing APS's misappropriated trade secrets.  Many of the trade secrets at issue will retain their value for at least a period of seven years.  Ex. 2, Amalfe Decl. ¶ 13.  Accordingly, the Court should enjoin BBH from competing as a distributor of aftermarket automotive parts for a period of seven years from the date of the injunction.  This seven-year production injunction would eliminate any commercial advantage derived from the misappropriation of trade secrets and would ensure BBH's ability to operate as a distributor of aftermarket automotive parts without utilizing, even mistakenly, APS's trade secrets.  Thereafter, a use injunction would be sufficient to protect APS's trade secrets from further misappropriation.

D.    The Court Should Order BBH to Pay Compensatory Damages

APS respectfully requests that this Court award APS compensatory damages.  As a result of BBH's use of APS's trade secret and confidential information, BBH has had a competitive advantage it would not otherwise have had.  Damages for misappropriation may include "both

the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."  Va. Code Ann. § 59.1-338(A); *see also Am. Sales Corp. v. Adventure Travel*, 862 F. Supp. 1476, 1479 (E.D. Va. 1994).  As alleged in the Complaint, APS lost profits as a result of BBH using its trade secret information to source products from at least one of its customers.  Compl. ¶¶ 63, 74.  If BBH had not sourced these products, the profits realized by BBH would have instead been realized by APS.  Thus, APS is entitled to its lost profits resulting from BBH sourcing products for Intex.  *See, e.g.*, *Nat'l Legal Research Grp. v. Lathan*, No. 92-0031-C, 1993 U.S. Dist. LEXIS 6681, at *28 (W.D. Va. May 17, 1993) (finding the value of projects placed with the defendant by the plaintiff's former clients to constitute the plaintiff's actual losses caused by the defendant's misappropriation).  During the forensic examination of Bruton's computer, APS discovered several invoices from BBH to Intex for parts that could have been sourced by APS.  Ex. 1, Cantwell Decl. at ¶ 6.  These invoices show that in 2012 alone, BBH invoiced Intex for over $23,500.00.  Not surprisingly, there also was a remarkable difference between the profits APS received from Intex in 2010 (before any misappropriation or tortious interference occurred) and those received in 2011 and 2012.  The total difference in profits equals $50,590.85.  Ex. 2, Amalfe Decl. at ¶¶ 18-20.

        APS is also entitled to compensation for the recreation costs of the trade secrets misappropriated by BBH and deleted by Bruton, an agent of BBH.  After his termination, Bruton surreptitiously entered APS's facility without authorization, accessed his former Company-computer, and deleted APS trade secret databases containing information about specifications for auto parts for vehicles dating back to 1985.  *Id.* at ¶¶ 10-13.  APS spent approximately $212,044.02 in time and resources to recreate these databases.  *Id.* at ¶ 15, Ex. 1.  Thus, while BBH continued to have access to and misappropriate APS's trade secrets, APS was denied

19

access to these trade secret databases and had to expend considerable efforts to recreate the same. Therefore, considering these recreation costs and the lost profits discussed above, the actual losses suffered by APS is at minimum $262,634.87.

BBH also was unjustly enriched by its use of the misappropriated trade secrets. Specifically, APS incurred costs to develop the trade secret information related to APS's prospective vendors, APS's relationships with current vendors, what parts were made at certain vendors, the quality of the parts made, the pricing for the parts, what vendor parts were then sold to specific APS customers and the selling price for the parts for each customer. BBH had access to this information and used it without having to undergo the same effort and expense to create it. As a result of the improper use, BBH has been able to offer competing services and products earlier than it would have otherwise had the sales, marketing, product development, sourcing and customer/vendor strategy for BBH been developed without improperly acquired information. John Amalfe, the President of APS, estimates that the amount of time and resources spent by Bruton alone in creating these business trade secrets for APS constitutes approximately $616,237.35. *Id.* at ¶ 16.

APS also seeks an award of compensatory damages in the amount of the compensation, benefits, and reimbursements paid by APS to Bruton and Huang during the time period when they were employed by BBH. Such an award is appropriate to compensate APS for BBH's unjust enrichment caused by misappropriation. Since BBH's formation in August 2011, APS paid Bruton $160,292.80 in salary, $5,693.16 in benefits, and $36,353.12 in business expenses. *Id.* at ¶ 8. During the same time period, APS paid Huang $50,590.25 in compensation and reimbursements. *Id.* at ¶ 9. For over a year, BBH benefitted from APS's continued payments to Bruton and Huang while they, unbeknownst to APS, served as agents of BBH, travelled at APS's

expense to conduct business on behalf of BBH, and misappropriated APS's trade secrets in conducting BBH business.   Thus, the full amount of compensatory damages resulting from BBH's misappropriation equals $ 1,131,801.55.  *See, e.g.*, *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974) (describing unjust enrichment as the calculation of "the benefits, profits, or advantages gained by the defendant in the use of the trade secret." (*quoting Int'l Indus., Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957))).

In the alternative, APS is entitled to an award of compensatory damages as a result of BBH's tortious inference with a contract and business expectancy.  Under Virginia law, "[c]ompensatory damages are those allowed as a recompense for loss or injury actually sustained." *Dillingham v. Hall*, 365 S.E.2d 738, 739 (Va. 1988).  Here, APS suffered actual damages as a result of BBH's inducement of Huang to violate her contract with APS in the amount of payments made to Huang during the time when she was in breach of her contract, acting as an agent for BBH, and directly competing with APS.  The compensation and reimbursements APS paid to Huang while she was representing BBH equals $50,590.25.  Ex. 2, Amalfe Decl. at ¶ 9.

APS also suffered actual damages as a result of BBH's interference with APS's business relationship with Intex.  As outlined above, APS suffered lost profits in the amount of at least $50,590.85 due to BBH's wrongful interference.  APS also is entitled to compensation equal to Bruton's salary, benefits, and business expenses from August 2011 forward, amounting to $202,339.08.  *Id.* at ¶ 8.  Bruton wrongfully took these payments from APS while breaching his fiduciary duty to APS, serving as an agent of BBH, and using APS's confidential and proprietary

information to interfere with APS's business relationship with Intex.  Because APS continued to pay Bruton's salary, benefits and expenses, BBH did not have to compensate him.

      E.     <u>This Court Should Award APS Post-Judgment Interest</u>

This Court should also award APS post-judgment interest under 28 U.S.C. §1961.  Post-judgment interest is "automatic from the date of entry of judgment . . . [when] recovered in civil cases in federal district courts." *Brinn v. Tidewater Transp. Dist. Comm'n*, 113 F. Supp. 2d 935, 938 (E.D. Va. 2000).  Post-judgment interest shall accrue "at the federal rate of interest as calculated using the formula set forth in 28 U.S.C. § 1961." *Id.* at 939.

      F.     <u>The Court Should Award Punitive Damages</u>

APS further respectfully requests this Court to enter an award of punitive damages in the amount of $350,000 pursuant to its willful and wanton misappropriation of trade secrets claim. If willful and malicious misappropriation is proven, the VUTSA permits a court to award punitive damages in an amount not to exceed twice the compensatory damages or $350,000, whichever amount is less.  Va. Code § 59.1-338(B).  APS has alleged undisputed facts sufficient to show that BBH acted willfully and maliciously in misappropriating APS's trade secrets. Specifically, the Skype chats uncovered during the forensic examination show that Bruton and Huang planned to start BBH as early as August 2011, that BBH intended to use Bruton and Huang's relationships with APS and APS's goodwill and reputation to generate business for BBH, that BBH (through Bruton) tried to direct APS to purchase parts from factories where BBH would receive a commission, and that Bruton and Huang discussed as early as December 2011 how to delete documents from APS's computers to hide their involvement with BBH. Compl. ¶ 57; *see also* Ex. 1, Cantwell Decl. at ¶ 7, Ex. C.  Bruton's actions on behalf of BBH, in which he breached his fiduciary duties to APS, constitute willful and malicious actions of the

misappropriation.  *Nat'l Legal Research Grp.*, 1993 U.S. Dist. LEXIS 6681, at *32.  As

discussed above, Defendants also took actions to conceal this misappropriation, including

Bruton's post-termination access to APS's facility and computer without authorization to delete

BBH files and APS trade secrets.  These acts show such a "gross indifference to the rights of

[APS] that amounts to willful conduct without just cause or excuse." *E.I. du Pont de Nemours &*

*Co. v. Kolon Indus., Inc.*, 2012 U.S. Dist. LEXIS 176909, at *8-9 (E.D. Va.  Dec. 13, 2012)

(quoting jury instruction for malicious and willful misappropriation).  Thus, APS is entitled to

punitive damages.

  The amount of compensatory damages APS is claiming for the misappropriation of its

trade secrets is $ 131,801.55, which in and of itself exceeds the $350,000 threshold.

Consequently, because APS has presented undisputed facts establishing malicious and willful

misappropriation, the Court should award APS $350,000 in punitive damages.

  G. This Court Should Award APS Attorneys' Fees

  APS is also entitled to its attorneys' fees and costs incurred in pursuing this matter.  The

VUTSA allows a court to award reasonable attorneys' fees if the court determines that: "(i) a

claim of misappropriation is made in bad faith, or (ii) willful and malicious misappropriation

exists."  Va. Code Ann. § 59.1-338.1.  For the reasons stated above, APS has alleged undisputed

facts establishing willful and malicious misappropriation.  Consequently, the Court may award

APS its reasonable attorneys' fees.  To date, the attorneys' fees and costs associated with the

investigation and litigation of this matter equal $58,997.72.  Ex. 3, Declaration of Robyn

Suzanne Gray ("Gray Decl.") at ¶ 9.[4]  These fees are equal to the amount that attorneys

customarily charge in rendering similar legal services.  *Id.* at ¶ 6.

## IV.  CONCLUSION

For the reasons stated above, APS respectfully requests that the Court enter default

judgment in its favor and against BBH, award APS $1,131,801.55 in compensatory damages and

$350,000 in punitive damages in its favor and against BBH, and enter an injunction permanently

enjoining BBH from using, for its own benefit or the benefit of any other person or entity, or

disclosing to any other person or entity in any manner, whether directly or indirectly, any and all

of APS's trade secrets, and a worldwide injunction enjoining BBH for a period of seven years,

from engaging in any manner or to any degree in the business of distributing aftermarket

automotive parts, and award APS $58,997.72  in attorneys' fees and costs, and post-judgment

interest as provided under 28 U.S.C. § 1961.

<div style="margin-left:40%">

Respectfully submitted,

AutoPartSource LLC

_____/s/_____
By Counsel

Rodney A. Satterwhite (VSB # 32907)
rsatterwhite@mcguirewoods.com
Robyn Suzanne Gray (VSB #45418)
rgray@mcguirewoods.com
McGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, VA 23219
Tel:  804-775-1000
Fax:  804-775-1061

*Counsel for Plaintiff AutoPartSource LLC*

</div>

---

[4] Upon the Court's request, McGuireWoods will submit its time entries for an *in camera* review to support APS's request for attorneys' fees.

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of May 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and I hereby certify that a true copy of the foregoing was served, via Federal Express, upon:

Stephen C. Bruton
2684 Shellgate Circle
Hayward, California  94545

and

William A. Sumpter, Registered Agent
 for BBH Source Group LLC
13800 Nuttree Woods Lane
Midlothian, VA  23112-0000


_____/s/_____
Rodney A. Satterwhite (VSB # 32907)
rsatterwhite@mcguirewoods.com
Robyn Suzanne Gray (VSB #45418)
rgray@mcguirewoods.com
McGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, VA 23219
Tel:  804-775-1000
Fax:  804-775-1061

*Counsel for Plaintiff AutoPartSource LLC*

25