IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

AUTOPARTSOURCE, LLC,      )
                        )
        Plaintiff,      )
                        )
v.                    )     Civil Action No. 3:13cv54–HEH
                        )
STEPHEN C. BRUTON, *et al.*,      )
                        )
        Defendants.      )

**MEMORANDUM OPINION**
**(Granting Default Judgment)**

In August 2010, Autopartsource, LLC ("Autopartsource") reassigned employee Stephen C. Bruton ("Bruton") to spearhead its effort to develop business in China. From the outset of his new responsibilities—and unbeknownst to Autopartsource—Bruton formed a new company to compete directly with Autopartsource. As he secretly developed this business—BBH Source Group, LLC ("BBH")—with two other partners, he misappropriated numerous Autopartsource trade secrets to his new company's benefit. He was fired almost immediately when his actions were discovered in December 2012. But in one last effort to gain an unfair competitive advantage, he broke into Autopartsource's California facility and deleted much of their databases containing the subject trade secrets.

Based on these events, Autopartsource brought this lawsuit against BBH and Bruton. BBH failed to file an answer or otherwise respond to the lawsuit, despite being properly served. Accordingly, this Court entered default against BBH on March 6, 2013.

Autopartsource now moves for default judgment, seeking $1,131,801.55 in compensatory

damages, $350,000 in punitive damages, $59,409.72 in attorneys' fees and costs, a

worldwide production injunction to last seven years, and a permanent injunction

prohibiting the use of Autopartsource's trade secrets. Given the extensive nature of the

remedies sought, the Court held an evidentiary hearing to address the matter on July 10,

2013. For the reasons that follow, the Court will grant default judgment, but will temper

somewhat the amount of damages and limit the scope of injunctive relief to a degree.

## I. FINDINGS OF FACT[1]

Because Defendant BBH is in default, the well-pleaded allegations in the

Complaint are deemed admitted for purposes of the Motion for Default Judgment. *Ryan

v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (quoting *Nishimatsu

Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (quoting

*Thomson v. Wooster*, 114 U.S. 104, 113 (1884) (citations and internal quotation marks

omitted))); *see also Directv, Inc. v. Rawlins*, 523 F.3d 318, 322 n.2 (4th Cir. 2008)

(citation omitted). Additionally, Autopartsource has submitted numerous documentary

---

[1]The Court exercises diversity jurisdiction over this case pursuant to 28 U.S.C. §
1332, because the amount in controversy exceeds $75,000 and the parties are completely
diverse. To be clear, the parties are completely diverse because Autopartsource is a
limited liability company whose members are all citizens of New Jersey; BBH is a
limited liability company whose members are citizens of China, California, and Virginia;
and, Bruton is a citizen of California. *Cent. W. Va. Energy Co. v. Mt. State Carbon, LLC*,
636 F.3d 101, 103 (4th Cir. 2012) ("For purposes of diversity jurisdiction, the citizenship
of a limited liability company . . . is determined by the citizenship of all of its
members."). Moreover, the Court properly exercises personal jurisdiction over
Defendant BBH pursuant to Va. Code § 8.01-328.1(A)(1), because BBH transacts
business in Virginia, and BBH's registered agent in Virginia accepted service of process
on its behalf. (Aff. of Service, ECF No. 5.)

2

exhibits and declarations and offered the testimony of John Amalfe ("Amalfe"), President of Autopartsource, at an evidentiary hearing. These sources form the basis for the following findings of fact.

Since 2004, Autopartsource has been in the business of manufacturing and distributing aftermarket automobile parts. (Compl. at ¶¶ 1, 9-10.) Generally, these parts are "sourced" in China—meaning, they are often manufactured by a third-party hired to do so by Autopartsource. (*Id.* at ¶12.) Over the course of its existence, Autopartsource has developed a body of proprietary information and trade secrets related to its business operations. These include industry contacts, customer information, pricing, costs, vendor information, and product development data. (*Id.* at ¶ 15.)

None of this information can be easily recreated from public sources without significant time, effort, and expense. (*Id.*) While its employees have access to its trade secrets, Autopartsource maintains a number of security features and policies designed to protect this information. (*Id.* at ¶¶ 16-21.) This includes a confidentiality policy governing all employees. (*Id.* at ¶ 21.)

Soon after its founding, Bruton obtained employment with Autopartsource as its Director of Product Development. (*Id.* at ¶ 24.) In this capacity, he would determine what aftermarket parts substitute for original parts in new and existing automobiles. Essentially, this data would allow Autopartsource to mimic existing automobile parts. According to Amalfe's testimony, this product development data is among Autopartsource's most valuable trade secrets. Additionally, Bruton had access to much of Autopartsource's other confidential and proprietary information, including customer

3

data, pricing information, and marketing data. (*Id.* at ¶ 27.) Of particular relevance to the allegations in this case, Bruton gained familiarity with Autopartsource's strategic relationship with Intex Auto Parts ("Intex"), a customer of Autopartsource. (*Id.*)

By 2010, Bruton's responsibilities at the company expanded to include the sourcing of automobile parts in China. (*Id.* at ¶ 29.) To prepare him for this role, Autopartsource trained Bruton for international work, reassigned Chinese national Lili Huang ("Huang") to work directly with him as a contractor, and sent him to a number of trade shows and to China to develop business relations in that country. (*Id.* at ¶¶ 29-33.) Huang had previously been hired in 2010 as a Quality Control Contractor, subject to an agreement that she would not represent any other company while contracted by Autopartsource. (*Id.* at ¶ 31.) In their new capacities, both Bruton and Huang obtained broader access to Autopartsource's trade secrets. (*Id.* at ¶ 35.)

In August 2011, unbeknownst to Autopartsource, Bruton and Huang formed BBH with the intent to compete directly with Autopartsource.[2] (*Id.* at ¶¶ 38-42, 57.) They intended from the outset to use Autopartsource's goodwill, business opportunities, trade secrets, and company resources to generate business for BBH. (*Id.* at ¶¶ 57, 62-66.) As one specific example, in January 2012, BBH brokered a deal to distribute brake rotors to Intex, an Autopartsource customer, even though Autopartsource had specifically sent Bruton to China to secure the same deal for itself. (*Id.* at ¶ 63.) Based on its contacts in the industry, Autopartsource has reason to believe that BBH is still doing business with

---

[2]Bruton and Huang had a third business partner, Mitchell Bennett, whose role in the company is not relevant here.

4

Intex.

By late December 2012, Huang came clean to her colleagues at Autopartsource, voluntarily disclosing the existence of BBH and Bruton's role in it. (*Id.* at ¶ 38.) After nearly one year in business, BBH was revealed as an unknown competitor operated by an employee and a contractor. (*Id.*) After confronting Bruton and terminating his employment, Autopartsource seized his company-supplied laptop computer. (*Id.* at ¶¶ 38-43.)

Bruton subsequently tricked a former co-worker to give him access to the laptop on December 31, 2012 for less than five minutes—purportedly to verify his accrued vacation time. (*Id.* at ¶ 47.) Somehow, Bruton (or someone acting on his behalf) again gained access to the laptop as many as two more times over the next day. (*Id.* at ¶¶ 49-50.) As computer forensic analysis later revealed, Bruton used these opportunities to delete much of Autopartsource's trade secrets, attempting to hide BBH's use of those materials and foreclosing Autopartsource's further use of much of its own proprietary information. (*Id.* at ¶ 51.)

After these events unfolded, Autopartsource brought this action against BBH and Bruton. All claims against Bruton have been automatically stayed because he has since filed for bankruptcy. Of relevance here, Autopartsource brings the following claims against BBH: (1) violation of the Virginia Uniform Trade Secrets Act ("VUTSA"); (2) tortious interference with contract; and, (3) tortious interference with business

expectancy.[3] BBH was properly served but failed to file any answer or otherwise defend the lawsuit within the proscribed time to do so (or since, for that matter). Accordingly, default was entered against BBH. Autopartsource now seeks default judgment, to include $1,131,801.55 in actual damages, $350,000 in punitive damages, $59,404.72 in attorneys' fees and costs, and broad worldwide and permanent injunctive relief. While it has clearly established liability, the Court ordered that an evidentiary hearing be held to determine whether the extent of relief sought is appropriate.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 55(a), a default is entered when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend. . . ." A subsequent entry of default judgment is left to the sound discretion of the trial court. *Payne v. Brake*, 439 F.3d 198, 203 (4th Cir. 2006); *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 810 (4th Cir. 1988).

> Rule 55 of the Federal Rules of Civil Procedure authorizes the entry of a default judgment when a defendant fails to plead or otherwise defend in accordance with the Rule. Although the clear policy of the Rules is to encourage dispositions of claims on their merits, trial judges are vested with discretion, which must be liberally exercised, in entering [default] judgments and in providing relief therefrom.

*U.S. v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982) (citations and internal quotation marks omitted); *see also United States CFTC v. PMC Strategy, LLC*, 903 F. Supp. 2d 368, 375

---

[3]As a federal court sitting in Virginia and exercising diversity jurisdiction, the Court applies Virginia's choice of law rules. *Felder v. Casey*, 487 U.S. 131, 151 (1988) (citation omitted). Because Autopartsource maintains its company headquarters in Virginia, injury from tortious conduct was suffered in Virginia. Thus, Virginia law governs the claims against BBH. *Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006).

(W.D.N.C. 2012) (citation omitted).

When a defendant is in default, the plaintiff's well-pleaded allegations are deemed admitted. *Ryan*, 253 F.3d at 780 (citations and internal quotation marks omitted). At the same time, "[t]he defendant is not held . . . to admit conclusions of law" and it remains the Court's responsibility to determine whether the allegations "support the relief sought." *Id.* (citations and internal quotation marks omitted). In fashioning appropriate relief, the district court may rely on affidavits and documentary evidence where appropriate, or instead conduct an evidentiary hearing if it deems it necessary. *United States CFTC*, 903 F. Supp. 2d at 375 (citations omitted).

## III. DISCUSSION

### A.   Claims Serving as the Basis for Damages

Autopartsource asserts three claims against BBH: (1) violation of VUTSA, (2) tortious interference with a contract, and (3) tortious interference with business expectancy. Deeming the allegations in the Complaint to be true, Autopartsource appears to have established liability on all three theories, but can only recover under two of those theories. The Court addresses each in turn.

### 1.   VUTSA

Under the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code §§ 59.1-336 through 343, misappropriation is defined as:

1.   Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

2.      Disclosure or use of a trade secret of another without express or implied consent by a person who:

     a.      Used improper means to acquire knowledge of the trade secret; or

     b.      At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

         (1)      Derived from or through a person who had utilized improper means to acquire it;

         (2)      Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

         (3)      Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

         (4)      Acquired by accident or mistake.

Va. Code § 59.1-336. In turn, "trade secrets" are defined as "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process," that:

1.      Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

2.      Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* Although there are several permissible avenues which the claim may be prosecuted under Va. Code § 59.1-336, Autopartsource need only satisfy one of the available subsections to state the claim.

Here, Bruton used his position at Autopartsource to acquire confidential and

proprietary information from his employer, including databases of current and

prospective vendors, product quality data, cost and pricing data, and historical sales data.

(Compl. at ¶¶ 66, 73.)  Based on the allegations, this information "[d]erives independent

value . . . from not being generally known" and Autopartsource has taken steps

"reasonable under the circumstances to maintain its secrecy." Va. Code § 59.1-336.

Knowing that these data sources constitute protected trade secrets—as demonstrated by

his attempts to destroy the information—Bruton stole this information and provided it to

BBH.  BBH accepted these trade secrets knowing that they were improperly taken from

Autopartsource by Bruton. *See* Va. Code § 59.1-336.  Thus, Autopartsource prevails in

its VUTSA claim against BBH.

### 2.    Tortious Interference with a Contract

To state a claim for tortious interference with a contract that is not terminable at-

will, as Autopartsource asserts is the case here, it must allege: (1) the existence of a valid

contractual relationship or business expectancy; (2) knowledge of the relationship or

expectancy on the part of the alleged tortfeasor; (3) intentional interference inducing or

causing a breach or termination of the relationship or expectancy; and, (4) resulting

damages. *Preferred Sys. Solns., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 687-88

(Va. 2012) (citing *Maximus v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375, 378 (Va.

1997); *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987)).  Unlike tortious interference

with an at-will contract—which is entitled to less protection—Autopartsource need not

allege the added element of "improper methods." *Cha v. Korean Presbyterian Church*,

553 S.E.2d 511, 515 (Va. 2001) (citation and internal quotation marks omitted).

9

Autopartsource seeks to hold BBH liable for tortiously interfering with Huang's contract. By virtue of Huang and Bruton's own knowledge, BBH knew that Huang was not permitted to perform work for Autopartsource's competitors, and that doing so was a breach of her contract. Nevertheless, BBH hired Huang to perform work for itself, thereby interfering with the contractual relationship between Huang and Autopartsource. Since the moment that BBH hired Huang, she was breaching her contract while continuing to accept payments from Autopartsource. Thus, Autopartsource suffered damages by paying Huang without receiving the full benefit of its bargain.

### 3.     Tortious Interference with Business Expectancy

Autopartsource further seeks to hold BBH liable for tortiously interfering with business expectancy when it usurped business from Intex. Because these contracts were terminable at-will, Autopartsource must prove not only the elements set forth *supra* at Section III(A)(2), but also the element of "improper methods." *Duggin*, 360 S.E.2d at 836 (quoting *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 337 S.E.2d at 748); Restatement (Second) of Torts § 766 cmt. g (1979)).

While it appears that Autopartsource can satisfy the elements of this claim, it cannot simultaneously seek recovery for this claim and its claim under VUTSA. As Autopartsource has noted, its claim for tortious interference with business expectancy is based in part on Bruton's use of "confidential and proprietary information" to secure BBH's contracts with Intex and other customers. (Pl.'s Mem. Supp. Mot. Entry of Default J. Against Def. BBH ("Pl.'s Mem.") at 10, ECF No. 17.) In other words, this is a common law tort theory for redress of BBH's misappropriation of trade secrets.

Under Virginia law, a party cannot receive damages for a common law tort if the underlying conduct involves an intentional misappropriation of a trade secret. *See Smithfield Ham and Prods. Co., Inc. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348-49 (E.D. Va. 1995) ("The plain language of the preemption provision indicates that the [Virginia Uniform Trade Secrets Act] was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret."); *see also S&S Computers & Design, Inc. v. Paycom Billing Servs.*, No. 5:00cv58, 2001 U.S. Dist. LEXIS 25874, at *8 (W.D. Va. April 9, 2001) ("[A] claim for breach of fiduciary duty, which is based on the misappropriation of a trade secret, is displaced by the VUTSA") (citing *NSW Corp. v. Ferguson*, 49 Va. Cir. 456, 457 (1999)). Thus, VUTSA provides the sole remedies for any claim for lost profits resulting from BBH's misappropriation of trade secrets.[4]

## B.     Compensatory Damages

Having prevailed on its VUTSA claim, Autopartsource seeks compensatory damages for BBH's misappropriation. It also seeks compensatory damages for its tortious interference claim based on the contract it had with Huang. In total, Autopartsource seeks $1,131,801.55. While Defendant BBH has not appeared to defend itself, the Court has an independent duty to ensure that the damages awarded are justified. *Ryan*, 253 F.3d at 780 (citations and internal quotation marks omitted). Here, a portion

---

[4] Here, the distinction is of no consequence, because VUTSA permits Autopartsource to recover for its lost income. Thus, any damages permitted under the common law claim for tortious interference with business expectancy would be duplicative anyway.

of Autopartsource's damages calculation appears to be unjustified.

With the sole exception of damages resulting from tortious interference with Huang's contract, VUTSA defines the exclusive scope of damages available. Under Va. Code § 59.1-338, damages for misappropriation "can include both the actual loss caused by misappropriation *and the unjust enrichment* caused by misappropriation that is not taken into account in computing actual loss." *Id.* (emphasis added). In other words, "[t]he Act dictates that plaintiff's loss plus defendant's unjust enrichment is the appropriate measure unless it would provide an inadequate sum." *Am. Sales Corp. v. Adventure Travel*, 862 F. Supp. 1476, 1479 (E.D. Va. 1994).

### 1.   Lost Profits

Autopartsource has submitted evidence showing that its revenue from Intex dropped $50,590.85 during the time that BBH was using misappropriated data to secure business from Intex. In the absence of any evidence to the contrary, it is undisputed that Autopartsource suffered lost profits in this amount because of BBH's misappropriation. Accordingly, the Court will award these damages.

### 2.   Cost to Recreate Data

As part of his misappropriation of trade secrets (or his attempt to hide it), Bruton deleted much of Autopartsource's valuable data. In doing so, he destroyed their access to valuable information, forcing them to recreate the data. According to Autopartsource, it cost $262,634.87 to repair the damage to its data done when Bruton deleted those files. Bruton's destruction of the data on Autopartsource computers benefitted BBH because it received an unfair competitive advantage from depriving Autopartsource of its own data.

This evidence is undisputed, so the Court will award that amount as compensatory damages.

### 3.      Estimated Misappropriation of Time and Resources

As unjust enrichment damages permitted by VUTSA, Autopartsource seeks compensation for the time and resources that it spent creating its trade secrets in the first place.  Essentially, the argument is that Autopartsource expended considerable time and resources generating the data, and BBH has been unjustly enriched by receiving this data at Autopartsource's sole expense and without having to expend its own time and resources.

Autopartsource submits the Declaration of John Amalfe ("Amalfe Decl.") in support of this argument, and Amalfe took the stand at the evidentiary hearing to address the issue in greater detail.  Based on his affidavit and testimony, Bruton spent the majority of his time throughout his employment at Autopartsource—approximately 75%—developing the trade secrets at issue.  (Amalfe Decl. at ¶ 17, ECF No. 17-2.)  More specifically, Amalfe explained that Bruton's principal role was to conduct the research and development that allowed Autopartsource to match its aftermarket auto parts to new and existing automobiles.  Related to this effort, he developed pricing, marketing, and product information that also constitute trade secrets.  As a fair estimate of the cost to develop these misappropriated trade secrets, Autopartsource seeks compensation for 75% of the total compensation paid to Bruton during his tenure—a sum of $616,237.35.  (*Id.*)

The Court credits Amalfe's testimony.  Based on his explanation at the evidentiary hearing, Amalfe has personal knowledge of the nature of Bruton's employment

throughout his time with the company. He articulated in extensive detail the types of trade secrets that Bruton developed and explained how he estimated that 75% of Bruton's employment was spent developing such information. This figure equals $616,237.35, and the Court will award that sum as unjust enrichment damages permited under Va. Code § 59.1-338(A).

### 4.   Bruton's Salary, Benefits, and Expenses

Autopartsource also seeks to recover from BBH all compensation paid to Bruton since he formed the competing company. These sums total $202,339.08 based on the following: (1) $160,292.80 in salary; (2) $5,593.16 in benefits; and, (3) $36,353.12 in expenses. The theory of recovery is essentially that BBH was unjustly enriched because Bruton was paid these sums for work performed in China, where he was actually spending his time and effort establishing BBH's business operations.

The problem with this argument is that it is inconsistent with Autopartsource's theory of recovery for the value of creating the trade secrets—representing 75% of Bruton's compensation throughout his employment, or $616,237.35. If it is true that Bruton spent 75% of his time providing valuable services to Autopartsource throughout his tenure—as Amalfe testified—then at most, Bruton spent 25% of his compensable time working for BBH. At most then, Autopartsource is entitled to 25% of Bruton's compensation since he formed BBH, as that represents the proportion of compensation unjustly enriching BBH.

Accordingly, the Court will award damages for unjust enrichment to BBH for compensation paid to Bruton in the amount of $50,584.77, representing one-quarter of

14

the $202,339.08 requested. While it is clear that Bruton performed work for BBH during time for which Autopartsource compensated him, he was still performing much valuable work for Autopartsource during that time. BBH was unjustly enriched in this way only to the extent that he was working for BBH while "on the clock" for Autopartsource.

### 5. Huang's Compensation

While some portion of Huang's compensation might fall in the category of unjust enrichment damages, the entire compensation paid since BBH's founding is squarely within the damages for tortious interference with a contract. In its contract with Huang, Autopartsource negotiated for exclusivity—that is, Huang could perform no work for competitors. (Compl. at ¶ 31.) By utilizing Huang's services for itself, BBH induced Huang to breach her contract with Autopartsource. The lack of exclusivity defeated a central purpose of the contract, thereby preventing Autopartsource from receiving the benefit of its bargain. Accordingly, the Court will award damages for the full amount of compensation and reimbursements paid to Huang since BBH employed her, which equals $50,590.25.

### C. Punitive Damages

Autopartsource seeks $350,000 in punitive damages, representing the maximum allowed by Virginia law. To obtain punitive damages under VUTSA, Autopartsource must show that BBH engaged in willful and malicious conduct. Va. Code § 59.1-338(B). "Willful conduct occurs when a party acts without regards for the rights of another, knowing injury will probably follow." *Am. Sales Corp. v. Adventure Travel*, 862 F. Supp. 1476, 1480 (E.D. Va. 1994) (citing *Owens-Corning Fiberglas Corp. v. Watson*,

413 S.E.2d 630, 639-40 (Va. 1992)).  Generally, such damages are disfavored under

Virginia law, so punitive damages are to be awarded "only in cases of the most egregious

conduct."  *Owens-Corning*, 413 S.E.2d at 639 (citation and internal quotation marks

omitted).  Even where punitive damages are appropriate, the Supreme Court of Virginia

instructs that:

> Review of the amount of punitive damages includes consideration of
> reasonableness between the damages sustained and the amount of the
> awards and the measurement of punishment required, whether the award
> will amount to a double recovery, the proportionality between the
> compensatory and punitive damages, and the ability of the defendant to
> pay.

*Condo. Servs. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 709 S.E.2d 163,

175 (Va. 2011) (citation and internal quotation marks omitted).

Here, the Court determines that this case is appropriate for an award of punitive

damages, but not quite at the level sought by Autopartsource.  First, Autopartsource has

proven that Bruton's conduct on behalf of BBH was willful, malicious, and unusually

egregious.  From the beginning of his assignment in China, Bruton had formed BBH and

used Autopartsource's trade secrets to divert business from his employer to his own

company.  As demonstrated by his numerous Skype conversations and the admission of

wrongdoing by Huang, BBH employees knew that what they were doing would violate

Autopartsource's rights and cause it harm.  Indeed, BBH sought to hide its employees'

misconduct.  Most troubling is Bruton's several break-ins at Autopartsource after he was

fired, during which he deprived Autopartsource of its own trade secrets by deleting

numerous computer files.  Such conduct was done with the intent not only to

misappropriate trade secrets to BBH's use, but to deprive Autopartsource of its own property. This is precisely the sort of "most egregious conduct" that justifies an award of punitive damages under Virginia law.

However, it appears that Autopartsource seeks an excessive amount, given the fact that it has offered no evidence about BBH's ability to pay punitive damages. *See, e.g., Condo. Servs.*, 709 S.E.2d at 175. The maximum allowed might represent a pittance to BBH, or it might eclipse the company's net worth tenfold. The record simply does not answer that question. Amalfe testified that he believes BBH is still in business based on information he has received from other sources in the industry. At most then, BBH has some value and is capable of paying some penalty for its misconduct here.

With little more to go on, the Court notes that the United States Sentencing Guidelines suggest a criminal fine for theft of trade secrets resulting in a comparable loss of between $7,500 and $75,000.[5] Given the egregious nature of the conduct here, but the

---

[5] In *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 504-506 & n.19 (2008), the Supreme Court recognized a number of parallels between criminal fines and punitive damages. While the Court did not equate a guidelines calculation with punitive damages, the parallels provide some guidance as to how a court might arrive at an appropriate figure. Indeed, the *Exxon* Court described punitive damages as "arbitrary," while explaining why the sentencing guidelines offer consistent ranges of fines. *Id.* at 505-06 (citing *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003)). This Court does not pretend to equate punitive damages to criminal fines in all respects, but considers the guidelines by analogy because of the arbitrary nature of the punitive damages request here.

According to U.S.S.G. §2B1.1, theft of a trade secret yielding a loss greater than $400,000 but less than $1,000,000 would result in a total offense level of 22. For an individual, this yields a fine between $7,500 and $75,000; for an organization this yields a fine of $1,200,000. While BBH is an organization, it is a closely held, small LLC and there is no evidence of any extensive organizational infrastructure. Thus, the Court deems it more appropriate to calculate punitive damages with reference to the guidelines

lack of evidence otherwise establishing BBH's ability to pay, the Court finds that

punitive damages in the amount of $75,000 are appropriate, as that would reflect the high

end of a criminal fine that an individual would face for analogous criminal conduct.

**D.   Attorneys' Fees**

Because the Court has determined BBH's misappropriation of trade secrets was

willful and malicious, *supra* at Section III(C), the Court may award Autopartsource its

reasonable attorney's fees and costs. Va. Code § 59.1-338.1(ii). Autopartsource seeks a

total fee award of $59,409.72, representing $52,464.37 in costs and attorneys' fees

charged by McGuireWoods and $6,945.35 in costs charged by Vestigant, a computer

forensics firm that analyzed evidence in this case. (First Decl. Robyn Suzanne Gray at ¶¶

7-9, ECF No. 17-3.)[6]

A trial court's award of attorneys' fees is reviewed for an abuse of discretion.

*EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 178 (4th Cir. 2009) (citing *Johnson v.

City of Aiken*, 278 F.3d 333, 336 (4th Cir. 2002)). Such a review is "sharply

circumscribed" because federal appellate courts recognize that the trial court "has close

and intimate knowledge of the efforts expended and the value of the services rendered,"

---

for an individual, rather than an organization. This is especially true since the guideline
fine for an organization would exceed Virginia's statutory cap of $350,000. Va. Code §
59.1-338(B).

[6] Inexplicably, the fee request increased to $61,872.46 between the time that the
Court ordered Autopartsource to correct a previously deficient fee request and the time
that it submitted the appropriate documentation. As far as the Court can discern, these
additional costs and fees were incurred at least in part to address the inadequacies in the
previous submission. (Suppl. Decl. Robyn Suzanne Gray Supp. Request Atty. Fees and
Expenses ("Suppl. Gray Decl.") Ex. B, ECF No. 25-1.) Accordingly, the Court finds
these additional fees inappropriate and will address them no further. The Court will,
however, include $412.00 in costs billed to Autopartsource after the initial submission.

so the award will not be overturned unless "clearly wrong." *Robinson v. Equifax Info.*

*Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009) (quoting *Plyler v. Evatt*, 902 F.2d 273,

277-78 (4th Cir. 1990)) (internal quotation marks omitted).  The lodestar method, the

product of the hours reasonably expended times a reasonable rate, generates a

presumptively reasonable fee.  *Pennsylvania v. Delaware Valley Citizens' Council for*

*Clean Air*, 478 U.S. 546, 564 (1986) (*Delaware Valley I*); *Robinson v. Equifax Info.*

*Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009) ("In calculating an award of attorney's

fees, a court must first determine a lodestar figure").

     Although "there is a 'strong presumption' that the lodestar figure is reasonable, . . .

that presumption may be overcome in those rare circumstances in which the lodestar does

not adequately take into account a factor that may properly be considered in determining

a reasonable fee." *Perdue v. Kenny A.*, 559 U.S. 542, 130 S. Ct. 1662, 1673 (2010).

While it is well within the discretion of the district court to determine the amount of the

fee, and to adjust the lodestar product upward or downward as it deems appropriate, "this

must be done on a principled basis, clearly explained by the court." *Lyle v. Food Lion,*

*Inc.*, 954 F.2d 984, 989 (4th Cir. 1992).  In general, the Court considers the following

twelve factors to analyze the lodestar:

> (1) the time and labor expended; (2) the novelty and difficulty of the
> questions raised; (3) the skill required to properly perform the legal services
> rendered; (4) the attorney's opportunity costs in pressing the instant
> litigation; (5) the customary fee for like work; (6) the attorney's
> expectations at the out-set of the litigation; (7) the time limitations imposed
> by the client or circumstances; (8) the amount in controversy and the results
> obtained; (9) the experience, reputation and ability of the attorney; (10) the
> undesirability of the  case within the legal community in which the suit

arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson*, 560 F.3d at 243–44. Consideration of these factors must be tempered because "the lodestar figure includes most, if not all, of the relevant factors constituting a reasonable attorney's fee." *Perdue*, 130 S. Ct. at 1673 (citation and internal quotation marks omitted).

Autopartsource has submitted two affidavits of counsel attesting to the reasonableness of the hourly rates charged and the reasonableness of the hours expended on the matter. (Decl. Lynn F. Jacob ("Jacob Decl.") at ¶¶ 7-8, ECF No. 23-2; Suppl. Gray Decl. at ¶¶ 5, 8.) Despite the uncontested nature of these attestations, the Court is somewhat troubled by the extraordinary legal fee requested, particularly since this litigation resulted in a default judgment. While the claims and investigation may have been complicated for a default judgment, no fewer than 63 hours were spent on the matter *after default was entered*—more than half the total hours spent on the matter. (Suppl. Gray Decl. Ex. B.) Based on several of the time entries, it appears that some of the added effort may be more closely related to a pending bankruptcy case in California. As those claims are not part of the default judgment rendered in this case, those are fees more appropriately sought in the other forum. *See Grissom v. The Mills Corp.*, 549 F.3d 313, 321 (4th Cir. 2008) (directing courts to "subtract fees for hours spent on unsuccessful claims unrelated to successful ones.").[7]

---

[7] The Court also notes that the attorneys' fees in this case were submitted in "block-billing form," whereby each time entry includes several different tasks billed together in a single time entry. Generally, this jurisdiction looks upon such billing

Turning now to the lodestar analysis, the Court first determines the proper hourly rates. *See Grissom*, 549 F.3d at 322. Counsel submits the following rates for attorneys who worked on this case:

| Attorney | Rate |
|---|---|
| Rodney A. Satterwhite | $540/hour |
| Robyn Suzanne Gray | $455/hour |
| Micah B. Schwartz | $350/hour |
| Summer L. Speight | $295/hour |

Additionally, a paralegal and reference librarian billed at rates of $275/hour and $230/hour, respectively. At first blush, the Court notes that these rates are somewhat higher than those permitted in the Alexandria Division of this Court after the Fourth Circuit's decision in *Grissom*. *See Taylor v. Mitre Corp.*, No. 1:11cv1247, 2013 U.S. Dist. LEXIS 19550, at *8-9 (E.D. Va. Feb. 13, 2013); *Porter v. Elk Remodeling, Inc.*, 1:09cv446, 2010 U.S. Dist. LEXIS 89037, at *19-20 (E.D. Va. Aug. 27, 2010). Nevertheless, the Court accepts the hourly rates as reasonable because they are well-supported by the declaration of a lawyer from another firm who is familiar with prevailing rates for work of this type in this market. (Jacob Decl. at ¶¶ 4-7.) In part, it was the lack of such documentation that resulted in a rate reduction in *Grissom*, so the analysis in that case does not apply with equal force here. 549 F.3d at 322.

---

practices with disfavor. *See, e.g., In re Outsidewall Tire Litigation*, 748 F. Supp. 2d 557, 566 n.24 (E.D. Va. 2010) (citing *In re Great Sweats, Inc.*, 113 B.R. 240, 244 (Bankr. E.D. Va. 1990), *vacated on other grounds*, 682 F.3d 292 (4th Cir. 2012). However, the Court has reviewed the time entries in this case and finds that the use of "block-billing" here does not significantly impede the Court's ability to review the time entries. Nevertheless, such improper "block-billing" further supports any reduction in total hours, as the Court determines is appropriate here, *infra*.

The Court is compelled, however, to reduce the total hours spent to reflect the uncontested nature of the litigation. This is especially necessary in a case such as this, where more than half of the hours spent on the matter occurred *after* default was entered. Counsel submits the following summary of hours spent on the matter:[8]

| Attorney/Para-Professional | Hours Spent on Matter |
|---|---|
| Rodney A. Satterwhite | 12.9 |
| Robyn Suzanne Gray | 82.6 |
| Micah B. Schwartz | 7.3 |
| Summer L Speight | 14.5 |
| Kathleen A. Walker (paralegal) | 1.1 |
| Doris Morgan (reference librarian) | 0.8 |

Attorneys in this Court frequently spend fewer than ten hours in cases where default judgment results. And while this case may be atypical, entry of default ordinarily signals the end of significant time and effort. Here, entry of default apparently led to more than half of the hours spent litigating the case. To account for this anomaly, the Court will reduce the total hours spent by each attorney by 25%—essentially reducing by half the hours spent after entry of default.

Applying the one-quarter reduction to the hours worked, the following table represents a summary of the reasonable hours spent multiplied by the reasonable hourly rate, yielding the lodestar:

---

[8] To account for the disparity between those fees initially requested and those added after the Court ordered Autopartsource to correct its supporting documentation, the Court has subtracted all fees incurred after May 22, 2013. (*See* First Decl. Robyn Suzanne Gray at ¶ 7, ECF No. 17-3.) *See supra* at 18 n.6.

| Timekeeper | Adjusted Hours | Hourly Rate | Total Fee Awarded |
|---|---|---|---|
| Rodney A. Satterwhite | 9.7 | $540/hr | $5,238.00 |
| Robyn Suzanne Gray | 62.0 | $455/hr | $28,210.00 |
| Micah B. Schwartz | 5.5 | $350/hr | $1925.00 |
| Summer L Speight | 10.9 | $295/hr | $3215.50 |
| Kathleen A. Walker (paralegal) | 0.8 | $275/hr | $220.00 |
| Doris Morgan (reference librarian) | 0.6 | $230/hr | $138.00 |
| **TOTAL** | | | **$38,946.50** |

Thus, the presumptively reasonable lodestar in this case is $38,946.50.

Considering the twelve discretionary factors that guide adjustments from the lodestar, *Robinson*, 560 F.3d at 243–44, the Court finds no reason to deviate further from the requested fee amount. Accordingly, the Court will grant, in part, the fee request and award Autopartsource $38,946.50 in attorney's fees. Additionally, having reviewed the costs incurred, including the costs for a forensic analysis of Bruton's computer, the Court finds that the requested costs of $7,797.96 were reasonably incurred. Accordingly, these costs will be awarded as well.

**E.      Injunctive Relief**

Autopartsource seeks two injunctions designed to remedy the theft of trade secrets by its competitor, BBH. The first of these injunctions seeks to permanently enjoin BBH's use of Autopartsource's trade secrets. Second, Autopartsource seeks to enjoin BBH's production of aftermarket automobile parts throughout the world for a period of seven years. Given the facts of the case, it is appropriate to permanently enjoin BBH's

23

use of stolen trade secrets. But, the second injunction is much too broad. Given the scope of injury here and the unusually broad scope of injunctive relief sought, the Court will issue an injunction akin to a production injunction, but with a more limited scope than that requested.

"[A] plaintiff seeking permanent injunction must satisfy a [familiar] four-factor test before a court may grant such relief." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). These factors include: (1) irreparable injury suffered by the party seeking an injunction; (2) demonstration that remedies available at law are inadequate; (3) balance of hardships; and, (4) the public interest. *Id.* In applying these factors, "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district court." *Id.* at 394. Similar analysis guides the decision to award injunctive relief under Virginia law. *Va. Beach S.P.C.A., Inc. v. S. Hampton Roads Veterinary Ass'n*, 329 S.E.2d 10, 13 (Va. 1985).

With respect to the scope of the injunction, the trial court is vested with considerable discretion. *See. Dixon v. Edwards*, 290 F.3d 699, 718 (4th Cir. 2002) (citation omitted). However, "'[i]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[].'" *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (quoting *Califano 20 v. Yamasaki*, 442 U.S. 682, 702 (1979)), overruled on different grounds in *Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 551 n.2 (4th Cir. 2012). Thus, an injunction should be tailored "to the circumstances of the case." *Id.* (citing *Hayes v. N. State Law*

*Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993)).  This includes reasonable

limitations as to time and geography.  *Id.*

### 1.   Permanent Injunction

Given the harm inflicted as a result of misappropriation of trade secrets in this

case, BBH will be permanently enjoined from using any of Autopartsource's trade

secrets.  Because VUTSA explicitly provides for injunctive relief, Autopartsource is not

required to demonstrate irreparable harm or the lack of an adequate remedy at law.  *E.I.*

*DuPont de Nemours & Co. v. Kolon Indus.*, 894 F. Supp. 2d 691, 704 (E.D. Va. 2012)

(citing *Capital Tool & Mfg. Co. v. Maschinenfabrik Herkules*, 837 F.2d 171, 172 (4th

Cir. 1988) (internal citations omitted)).  Thus, to permanently enjoin BBH's use of its

trade secrets, Autopartsource need only show that the balance of hardships and public

interest favor injunctive relief.  Autopartsource meets both requirements.

Based on the facts of this case, BBH willfully misappropriated valuable trade

secrets when Bruton stole them from Autopartsource.  At the expense of Autopartsource,

BBH received valuable sales, marketing, pricing, customer, and vendor quality data.

Worse, this was done by a competing company founded in part by an employee and a

contractor in whom Autopartsource had trusted this information.  Autopartsource has

submitted uncontested evidence that it has lost at least one customer as a direct result of

BBH's unlawful actions.  Without an injunction it could lose countless other customers in

the future.  Conversely, BBH has no legal right to use Autopartsource's trade secrets.

The harm done to Autopartsource clearly outweighs any legitimate interests of BBH.

Further tipping the balance of hardship in Autopartsource's favor is the difficulty it faces in proving future loss. As Amalfe testified at the evidentiary hearing, BBH appears to remain operational. But because BBH did not appear to defend the case, no discovery exists to aid Autopartsource in proving how much future business it might lose from any continued misappropriation of trade secrets in BBH's pursuit of new customers. In the Fourth Circuit, such difficulty establishing monetary damages favors injunctive relief. *E.I. DuPont de Nemours & Co.*, 894 F. Supp. 2d at707 (citing *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551-52 (4th Cir. 1994)). "That principle takes on special meaning when the damages would entail proof of the loss of customers or lost sales." *Id.* (citing *Multi-Channel*, 22 F.3d at 551-52 (citing *Merrill Lynch, Pierce, Fenner and Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985))). The probability of losing future customers to BBH as a direct result of its unlawful conduct strongly favors injunctive relief.

The public interest is also served by a permanent injunction. "[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the [trade secret owner]'s rights and protecting the public from the injunction's adverse effects." *Id.* at 709 (citation and internal quotation marks omitted). With respect to trade secrets, the Virginia General Assembly expressed such a public interest when it explicitly provided for injunctive relief for violations of VUTSA, and courts have recognized the strong public interests at stake when a company's trade secrets are stolen. *E.I. DuPont de Nemours & Co.*, 894 F. Supp. 2d at 710; *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 369 F. Supp. 2d 725, 736 (E.D. Va. 2005).

While there also exists a public interest in free competition, that interest typically bows to the interests in protecting trade secrets absent some justification to the contrary. *See, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 119 n.14 (1980) (noting Commission's consideration of public interest in publicly disclosing information obtained by it unless it relates to a trade secret).

Here, the admittedly one-sided record evinces egregious conduct in stealing a trade secret from a competitor. Bruton, a trusted employee, stole Autopartsource's valuable secrets, then went further and destroyed Autopartsource's digital versions. The public interest in ameliorating such behavior weighs heavily in the analysis. Any public interest in free competition is tempered by the fact that BBH's conduct here is not representative of fair competition, but unfair theft of a competitor's proprietary information. *See, e.g., E.I. DuPont de Nemours & Co.*, 894 F. Supp. 2d at 710 ("[T]he public interest is not served by unfair competition fostered by the theft of a competitor's trade secrets."). Indeed, as the Supreme Court has proclaimed before, "[t]he maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law. The necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974) (citation and internal quotation marks omitted).

Based on these findings, BBH shall be permanently enjoined from using any of the subject trade secrets misappropriated from Autopartsource.

## 2.    Worldwide Production Injunction

In addition to enjoining BBH's use of stolen trade secrets, Autopartsource seeks

an unusually broad production injunction "enjoin[ing] BBH from competing as a

distributor of aftermarket automotive parts." (Pl.'s Mem. at 13.)  In other words, BBH

would be effectively ordered to cease all production, regardless of whether it uses trade

secrets in doing so.  Autopartsource's request will be granted in part, with the Court

circumscribing the scope of the injunction to a more appropriate degree.

In a handful of cases, federal courts have recognized the necessity of "production

injunctions" where circumstances render a basic "use injunction" insufficient to prevent

further misappropriation of trade secrets.[9]  "[W]here the misappropriated trade secrets are

inextricably connected to the defendant's manufacture of the product, a use injunction is

ineffective because the misappropriator cannot be relied upon to unlearn or abandon the

misappropriated technology." *E.I. DuPont De Nemours*, 894 F. Supp. 2d at 711

(citations and internal quotation marks omitted).  Such an "inextricable connection"

exists when the misappropriator "would not be able independently to manufacture or

design a comparable product" without the stolen trade secrets. *Id.* (citations and internal

---

[9]A representative sample of these cases includes *Viscofan, S.A. v. U.S. Int'l Trade Comm'n*, 787 F.2d 544 (Fed. Cir. 1986) (enjoining sale of products in United States arising out of misappropriation of trade secrets adjudicated by U.S. International Trade Commission); *Aerosonic Corp. v. Trodyne Corp.*, 402 F.2d 223 (5th Cir. 1968) (affirming production injunction); *E.I. DuPont De Nemours*, 894 F. Supp. 2d 691 (imposing production injunction on foreign competitor); *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005) (recognizing availability of production injunction but denying such relief in that case); *Wyeth v. Natural Biologics, Inc.*, No. 98-2469, 2003 U.S. Dist. LEXIS 17713 (D. Minn. Oct. 2, 2003) (granting production injunction where defendant attempted to hide misappropriation); *Gen. Elec. Co. v. Chien-Min Sung*, 843 F. Supp. 776 (D. Mass. 1994) (imposing production injunction where entire manufacturing process depends upon the misappropriated trade secrets); *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205 (W.D.N.Y. 1994) (emphasizing the inability of misappropriator to divorce knowledge of trade secret from future production).

quotation marks omitted). In other words, if "the misappropriator would have difficulty completely divorcing his knowledge of the misappropriated trade secrets from a future production of the product," then a production injunction may be appropriate. *Id.* (citing *Monovis*, 905 F. Supp. at 1234).

To determine the propriety of a production injunction, a court may consider the extent of bad faith on the defendant's part as indicative of expected noncompliance, *id.* at 711-12, including efforts to "conceal the misappropriation by destroying evidence." *Id.* (citing *Wyeth*, 2003 U.S. Dist. LEXIS 17713, at *73). If a misappropriator "cannot be trusted to avoid using the misappropriated process and cannot be trusted to obey an Order," then a production injunction may be warranted. *Id.* (citation and internal quotation marks omitted).

BBH's conduct here warrants such an injunction, though slightly different in scope from a so-called "production injunction." As the Court already explained, *supra* at Section III(C), the misappropriation here was willful and malicious. Indeed, BBH appears to have been formed with the intent to capitalize on Bruton and Huang's theft of Autopartsource's trade secrets. As Amalfe testified, BBH gained an unfair head-start, almost immediately sourcing product from China using the proprietary information that Bruton had developed in his employment at Autopartsource. Without Autopartsource's industry contacts, customer information, pricing data, vendor information, and product development data, BBH would not be operating as it currently is—sourcing aftermarket auto parts from China. In this way, the misappropriated trade secrets are "inextricably connected" to BBH's business activities. *E.I. DuPont De Nemours*, 894 F. Supp. 2d at

711.

Also, through Bruton, the databases containing those trade secrets were destroyed in an attempt to deprive Autopartsource of its own intellectual property. To accomplish this, Bruton went so far as to break into Autopartsource's facility, access his old company computer, and delete some of Autopartsource's databases. If the members of BBH are willing to go to such lengths to divest Autopartsource of its own trade secrets, then they cannot be trusted to abide by a general use injunction. *Id.* (citing *Monovis*, 905 F. Supp. at 1235). Under these circumstances, only an injunction akin to a "production injunction" will sufficiently protect Autopartsource's rights going forward.

Such an injunction, however, is not a "production injunction" in the true sense. Unlike the situation in *E.I. DuPont De Nemours*, BBH is not manufacturing products using Autopartsource's trade secrets. Rather, it is using the trade secrets to "source" products from China. As Amalfe explained this business term, "sourcing" refers to the hiring of a third party to manufacture the product. Although Autopartsource may provide design specifications to those facilities that "source" its products, it does not itself manufacture the products. Likewise, BBH is now "sourcing" products in China by using the product information, customer information, and other trade secrets misappropriated from Autopartsource. Consequently, a "production injunction" *per se* would be a misnomer, as neither BBH nor Autopartsource are manufacturing their own products.

Analogizing a "production injunction" to what might properly be called a "sourcing injunction," the Court will enjoin BBH from sourcing those products that Autopartsource sourced in China during Bruton's tenure with the company. Thus, BBH

will not be prohibited from sourcing those products that Autopartsource does not deal in—such as oxygen sensors.  Such an injunction will be more readily enforceable than a traditional "use injunction," because Autopartsource may more easily identify violations based on the products that BBH sells in the relevant marketplace, and by determining where they were manufactured.  Should BBH be found to sell any of the enjoined products, and if those products originated in China, then Autopartsource may seek enforcement in this Court through contempt proceedings.  *Bradley v. Am. Household, Inc.*, 378 F.3d 373, 378 (4th Cir. 2004).

      As to the temporal and geographical scope of the sourcing injunction, the Court finds the requested scope to be too broad.  A worldwide sourcing injunction goes beyond the necessary boundaries in this case.  Although "'[i]n the abstract, most confidential information is worthy of protection without geographic limitation,'" it is also true that "'[a]s a practical matter . . . geographical limits often can be set.'"  *E.I. DuPont De Nemours*, 894 F. Supp. 2d at 714 (quoting *Nordson Corp. v. Plasschaert*, 674 F.2d 1371, 1377 (11th Cir. 1982)).  Here, the evidence establishes only that BBH and Autopartsource were conducting business in China and the United States—with China serving as the source of aftermarket auto parts and United States serving as the market for distribution.  Likewise, those trade secrets related to customer information, pricing, costs, and vendor information are limited to those markets.  Thus, it is reasonable to limit the scope of the sourcing injunction to commerce within the Chinese and United States markets, rather than to impose a worldwide sourcing injunction, as Autopartsource

requests.[10]

Finally, Autopartsource's request for a seven year duration for the "sourcing injunction" is also too broad. In *E.I. DuPont De Nemours*, this Court imposed a twenty year production injunction where the defendant had repeatedly demonstrated over several decades that it was unable to manufacture the product at issue. That is not the situation here, where Amalfe testified that Bruton had developed nearly all of the trade secrets at issue. Thus, he is well-equipped with the skills necessary to independently develop the very same trade secrets, particularly those related to product development. So although a sourcing injunction is necessary to prevent further harm to Autopartsource, a duration of seven years is somewhat punitive in character, which goes beyond the relief authorized under VUTSA. *See, e.g., Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 545 (4th Cir. 2007) (citation omitted) (rejecting injunction of a "punitive character" in the copyright context); *see also Va. Soc'y for Human Life*, 263 F.3d at 393 ("Injunctive relief should be no more burdensome to the defendant than necessary"). Instead, a sourcing injunction of three years appears to be adequate to counteract the unfair advantage that BBH received in relation to Autopartsource.

Accordingly, the Court will deny Autopartsource's request for a seven year worldwide production injunction. Instead, the Court will grant a sourcing injunction enjoining BBH from sourcing and distributing those products that Autopartsource dealt with during Bruton's tenure. Such an injunction shall be limited to commerce in and

---

[10]While certain trade secrets related to product design may be misappropriated worldwide, such misappropriation will be governed by the permanent injunction forbidding any use of the trade secrets, which is worldwide in scope.

between China and the United States, and shall last for three years.

## IV.  CONCLUSION

In sum, and for the reasons set forth in this Memorandum Opinion, the Court will enter default judgment in Autopartsource's favor and award $980,047.84 in compensatory damages and $75,000 in punitive damages for BBH's violation of VUTSA; $50,590.25 in compensatory damages for tortiously interfering with Huang's contract; Attorneys' fees of $38,946.50; and, costs of $7,797.96.  Furthermore, the Court will permanently enjoin BBH's use of the subject trade secrets, to be set forth in a separate order to be prepared by counsel.  Finally, the Court will enjoin BBH from sourcing any of those products that were distributed by Autopartsource during Bruton's tenure at Autopartsource for a duration of three years in and between the markets of China and the United States.

An appropriate Judgment Order will accompany this Memorandum Opinion, entering the monetary judgment and directing Plaintiff's counsel to prepare an Injunction Order consistent with this Memorandum Opinion.

/s/ _____

Henry E. Hudson
United States District Judge

Date: _July 16, 2013_
Richmond, Virginia